**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | |
|---|---|
| BNSF RAILWAY COMPANY, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
|      v. | ) |
| | ) |
| SANJAY CHOPRA, individually; | ) |
| | ) |
| SANJAY CHOPRA, as the Next Friend of A.C., a Minor; | ) |
| | ) |
| TERRY SEABORN, as the Next Friend of D.S., a Minor; | ) |
| | ) |
| GARY JONES, individually; | ) |
| YANTI MANURUNG, individually; | ) |
| JOANN SURKO, individually; | ) |
| DAWN MCDONALD, individually; | ) |
| DAX MCDONALD, individually; | ) |
| SAMANTHA MCDONALD, individually; | ) |
| SHEELY MCDONALD, individually; | ) |
| JANELLE BUFFALO, individually; | ) |
| PRESLEY HOOVER, individually; | ) |
| JENNIFER KLEEHAMER, individually; | ) |
| BETH PETTIGREW, individually; | ) |
| ADRIENNE PRICE, individually; | ) |
| KYLIE SCHMIDT, individually; | ) |
| MARK SCHMIDT, individually; | ) |
| MARTA SCHWEITZER, individually; and | ) |
| MICHAEL SMITH, individually. | ) |
| | ) |
|      Defendants. | ) |

## COMPLAINT TO COMPEL ARBITRATION

For its Complaint to Compel Arbitration against Defendants, Plaintiff BNSF Railway

Company ("BNSF") states as follows:

1

00129117

## NATURE OF THE ACTION

1.      This is an action for relief under the Federal Arbitration Act, 9 U.S.C. § 4, arising out of Defendants' refusal to comply with the terms of a pre-dispute arbitration agreement binding upon the parties in connection with Defendants' state-court claims against BNSF.  BNSF seeks an Order from this Court compelling arbitration of Defendants' claims, staying the pending Missouri state court actions Defendants have filed against BNSF and enjoining Defendants from pursuing the state court actions against BNSF while the parties arbitrate their claims.

## THE PARTIES

2.      BNSF Railway Company is a Delaware corporation with its principal place of business in the state of Texas.

3.      Sanjay Chopra is domiciled in Wisconsin with his minor son A.C., owns personal and real property in Wisconsin, and pays taxes in Wisconsin. Therefore, he is a citizen of Wisconsin.

4.      Terry Seaborn is domiciled in Wisconsin with his minor son D.S., owns personal and real property in Wisconsin, and pays taxes in Wisconsin. Therefore, he is a citizen of Wisconsin.

5.      Gary Jones is domiciled in California, owns personal and real property in California, and pays taxes in California. Therefore, he is a citizen of California.

6.      Yanti Manurung is domiciled in Illinois and owns and/or maintains personal and real property in Illinois. Therefore, she is a citizen of Illinois.

7.      Joann Surko is domiciled in California, owns personal and real property in California, pays taxes in California, and holds a driver's license in California. Therefore, she is a citizen of California.

2

8.    Dawn McDonald is domiciled in Arizona, owns personal and real property in Arizona, and pays taxes in Arizona. Therefore, she is a citizen of Arizona.

9.    Dax McDonald is domiciled in Arizona, owns personal and real property in Arizona, and pays taxes in Arizona. Therefore, he is a citizen of Arizona.

10.    Samantha McDonald is domiciled in Arizona, owns personal and real property in Arizona, and pays taxes in Arizona. Therefore, she is a citizen of Arizona.

11.    Sheely McDonald is domiciled in Arizona, owns personal and real property in Arizona, and pays taxes in Arizona. Therefore, she is a citizen of Arizona.

12.    Janelle Buffalo is domiciled in New Mexico, owns personal and real property in New Mexico, and pays taxes in New Mexico. Therefore, she is a citizen of New Mexico.

13.    Presley Hoover is domiciled in Ohio, owns personal and real property in Ohio, and pays taxes in Ohio. Therefore, she is a citizen of Ohio.

14.    Jennifer Kleehamer is domiciled in Ohio, owns personal and real property in Ohio, pays taxes in Ohio, and holds a driver's license in Ohio. Therefore, she is a citizen of Ohio.

15.    Beth Pettigrew is domiciled in Ohio, owns personal and real property in Ohio, pays taxes in Ohio, and holds a driver's license in Ohio. Therefore, she is a citizen of Ohio.

16.    Adrienne Price is domiciled in Ohio, owns personal and real property in Ohio, pays taxes in Ohio, and holds a driver's license in Ohio. Therefore, she is a citizen of Ohio.

17.    Kylie Schmidt is domiciled in Ohio, owns personal and real property in Ohio, pays taxes in Ohio, and holds a driver's license in Ohio. Therefore, she is a citizen of Ohio.

18.    Mark Schmidt is domiciled in Ohio, owns personal and real property in Ohio, pays taxes in Ohio, and holds a driver's license in Ohio. Therefore, he is a citizen of Ohio.

3

00129117

19.     Marta Schweitzer is domiciled in Ohio, owns personal and real property in Ohio, and pays taxes in Ohio. Therefore, she is a citizen of Ohio.

20.     Michael Smith is domiciled in California, owns personal and real property in California, and pays taxes in California. Therefore, he is a citizen of California.

## AMOUNT(S) IN CONTROVERSY

21.     In his underlying state court action, Sanjay Chopra claims he "sustained severe injuries," including "serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[1] Based on Mr. Chopra's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

22.     In his underlying state court action, minor A.C. claims he "sustained severe injuries," including "serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[2] Based on A.C.'s allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

23.     In his underlying state court action, minor D.S. claims he "sustained severe injuries," including "serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and

---

[1] Ex. 1, First Amended Petition in Chariton County Case No. 24CH-CC00017, at ¶ 105.
[2] *Id.*, at ¶ 106.

emotional distress."[3] Based on A.C.'s allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

24.    In his underlying state court action, Gary Jones claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[4] Mr. Jones further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Mr. Jones's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

25.    In her underlying state court action, Yanti Manurung claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[5] Ms. Manurung further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Manurung's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

26.    In her underlying state court action, Joann Surko claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering,

---

[3] *Id.*, at ¶ 107.
[4] Ex. 2, First Amended Petition in Chariton County Case No. 24CH-CC00026, at ¶ 105.
[5] *Id.*, at ¶ 106.

00129117

property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[6] Ms. Surko further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Surko's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

27.     In her underlying state court action, Dawn McDonald claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[7] Ms. McDonald further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. McDonald's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

28.     In his underlying state court action, Dax McDonald claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[8] Mr. McDonald further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Mr. McDonald's allegations, it cannot

---

[6] *Id.*, at ¶ 107.
[7] Ex. 3, First Amended Petition in Chariton County Case No. 24CH-CC00027, at ¶ 105.
[8] *Id.*, at ¶ 106.

00129117

be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

29.      In her underlying state court action, Samantha McDonald claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[9] Ms. McDonald further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. McDonald's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

30.      In her underlying state court action, Sheely McDonald claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[10] Ms. McDonald further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. McDonald's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

31.      In her underlying state court action, Janelle Buffalo claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and

---

[9] *Id.*, at ¶ 107.
[10] *Id.*, at ¶ 108.

7

future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[11] Ms. Buffalo further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Buffalo's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

32.    In her underlying state court action, Presley Hoover claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[12] Ms. Hoover further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Hoover's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

33.    In her underlying state court action, Jennifer Kleehamer claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[13] Ms. Kleehamer further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Kleehamer's allegations,

---

[11] Ex. 4, First Amended Petition in Chariton County Case No. 24CH-CC00028, at ¶ 118.
[12] *Id.*, at ¶ 119.
[13] *Id.*, at ¶ 120.

it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

34.    In her underlying state court action, Beth Pettigrew claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[14] Ms. Pettigrew further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Pettigrew's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

35.    In her underlying state court action, Adrienne Price claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[15] Ms. Price further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Price's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

36.    In her underlying state court action, Kylie Schmidt claims she "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and

---

[14] *Id.*, at ¶ 121.
[15] *Id.*, at ¶ 122.

9

future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[16] Ms. Schmidt further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Ms. Schmidt's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

37.     In his underlying state court action, Mark Schmidt claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[17] Mr. Schmidt further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Mr. Schmidt's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

38.     In her underlying state court action, Marta Schweitzer claims she "sustained severe injuries." She claims she "sustained injuries to her abdomen, mid, upper, and lower back, cervical, thoracic, and lumbar spine, legs, hips, shoulders, arms, head, teeth, and mouth." She claims she "has suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, property damages, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and

---

[16] *Id.*, at ¶ 123.
[17] *Id.*, at ¶ 124.

10

00129117

emotional distress."[18] Based on Ms. Schweitzer's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

39.     In his underlying state court action, Michael Smith claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[19] Based on Mr. Smith's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

## JURISDICTION AND VENUE

40.     This Court has original jurisdiction arising under 28 U.S.C. § 1332 because none of the Defendants are citizens of Delaware or Texas so there is complete diversity of citizenship between BNSF and Defendants, and the amount in controversy—for each respective Defendant in his or her underlying state court claim(s)—exceeds $75,000.

41.     Jurisdiction of this Court is further invoked under 9 U.S.C. § 4.

42.     This Court has personal jurisdiction over these Arizona, California, Wisconsin, Illinois, and Ohio resident Defendants because they consented as plaintiffs in their underlying State Court Actions.

43.     Venue is proper under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to Defendants' underlying State Court Actions occurred in this district.

## FACTUAL ALLEGATIONS

44.     Defendants' state court claims arise out of an incident that occurred on June 27, 2022, while Sanjay Chopra, A.C., D.S., Gary Jones, Yanti Manurung, Joann Surko, Dawn

---

[18] Ex. 5, First Amended Petition in Chariton County Case No. 25CH-CC00007, at ¶ 100.
[19] Ex. 6, Petition in Chariton County Case No. 25CH-CC00006, at ¶ 76.

McDonald, Dax McDonald, Samantha McDonald, Sheely McDonald, Janelle Buffalo, Presley Hoover, Jennifer Kleehamer, Beth Pettigrew, Adrienne Price, Kylie Schmidt, Mark Schmidt, Marta Schweitzer, and Michael Smith were traveling as passengers on National Railroad Passenger Corporation ("Amtrak") Train 4, also known as the Southwest Chief.

45.     Train 4 was traveling from Los Angeles to Chicago when it struck a dump truck negligently and recklessly operated by an employee of M.S. Contracting, LLC at U.S. Department of Transportation Crossing No. 005284Y near Mendon, Missouri. The collision with the dump truck caused Train 4 to derail allegedly resulting in injuries to the respective Defendants.

46.     To purchase a ticket from Amtrak, whether on the website, mobile website, or app, customers must first affirmatively accept Amtrak's Terms and Conditions, which include a mutual agreement to arbitrate any claims between the customer and Amtrak ("Arbitration Agreement").

47.     When making an online ticket purchase through Amtrak's website, before they can complete their purchase, passengers must click a box acknowledging that they "have read and agree[d] to the terms and conditions, including the binding arbitration agreement…" An exemplar is below:

> ☑ I have read and agree to the terms and conditions, including the binding arbitration agreement and rules regarding COVID travel. The privacy policy applies.

48.     This provision also contains a link directly to the Terms and Conditions which may be found at https://www.amtrak.com/terms-and-conditions.html

49.     Defendants Janelle Buffalo, Presley Hoover, Jennifer Kleehamer, Beth Pettigrew, Adrienne Price, Kylie Schmidt, Mark Schmidt, and Marta Schweitzer utilized Amtrak "group booking" to purchase tickets via telephone through the group's representative, Beth Pettigrew.

00129117

50.     Upon the group's booking, Amtrak sent a letter to Ms. Pettigrew that stated, "Transportation on Amtrak is subject to the terms and conditions on your ticket and associated ticket jacket. Additional terms and travel information can be found on Amtrak.com."

51.     Amtrak then mailed each of the respective group members—including Janelle Buffalo, Presley Hoover, Jennifer Kleehamer, Beth Pettigrew, Adrienne Price, Kylie Schmidt, Mark Schmidt, and Marta Schweitzer—paper tickets and ticket jackets that stated, "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL."

52.     Defendants Sanjay Chopra, A.C., and D.S. also utilized Amtrak "group booking" to purchase tickets via telephone through the group's representative, Craig Thoms.

53.     Upon the group's booking, Amtrak sent a letter to Mr. Thoms that stated, "Transportation on Amtrak is subject to the terms and conditions on your ticket and associated ticket jacket. Additional terms and travel information can be found on Amtrak.com."

54.     Amtrak then mailed each of the respective group members—including Sanjay Chopra, A.C., and D.S.—paper tickets and ticket jackets that stated, "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL."

55.     Defendants each respectively agreed to Version 2.9.16 of Amtrak's Terms and Conditions.

56.     A true and correct copy of Version 2.9.16 of the Terms and Conditions is attached as Exhibit 7.

57.     At the very top of those Terms and Conditions is a notice that states:

"These terms and conditions contain a binding Arbitration Agreement below. Please read the Arbitration Agreement carefully because it applies mutually to You and Amtrak and requires that you resolve claims and disputes with Amtrak on an individual basis through arbitration and not by way of court or jury trial. By purchasing a ticket for travel on Amtrak, You are agreeing to these terms and conditions and agreeing to the Arbitration Agreement."

Ex. 7, at p. 1.

58.     The Arbitration Agreement states:

"Mutual Agreement to Arbitrate ("Arbitration Agreement"). This Arbitration Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, applies to **all claims**, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration. Amtrak and Customer (**on behalf of yourself and any individuals for whom you purchase tickets, including, without limitation, family members, minor passengers, colleagues and companions** (collectively "You" or "Your"), **AGREE that this Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad, based upon or related to:** these Terms and Conditions, breach of contract, **tort claims, common law claims,** Your relationship with Amtrak, tickets, services and accommodations provided by Amtrak, carriage on Amtrak trains and equipment, **any personal injuries (including, but not limited to, claims for negligence, gross negligence, physical impairment, disfigurement, pain and suffering, mental anguish, wrongful death, survival actions, loss of consortium and/or services, medical and hospital expenses, expenses of transportation for medical treatment, expenses of drugs and medical appliances, emotional distress, exemplary or punitive damages arising out of or related to any personal injury),** and any claims for discrimination and failure to accommodate, which shall be decided by a single arbitrator through binding arbitration and not by a judge or jury."

Ex. 7, at pp. 58-61 (emphasis added).

59.     The Arbitration Agreement also correctly notes that it "is governed by the Federal

Arbitration Act ('FAA') and evidences a transaction involving commerce." *See* 9 U.S.C. § 1

(""Commerce,' as herein defined, means commerce among the several States or with foreign

nations, or in any Territory of the United States or in the District of Columbia, or between any

such Territory and another, or between any such Territory and any State or foreign nation, or

14

00129117

between the District of Columbia and any State or Territory or foreign nation…"); *see also* 9 U.S.C. § 2 ("A written provision in…a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract…shall be valid, irrevocable, and enforceable…"). *Id.*

60.    The Arbitration Agreement permits "any party to which Amtrak owes indemnity…including without limitation any host railroad" to enforce its terms. The Arbitration Agreement states: "[T]his Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or **against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad** . . ." *Id.* (emphasis added)

61.    BNSF is a host railroad to which Amtrak owes indemnity, and, therefore, BNSF is expressly entitled to enforce the Arbitration Agreement.

62.    Customers cannot complete their online or in-app ticket purchase until the box signaling agreement to the Terms and Conditions including the binding arbitration agreement is checked.

63.    Passengers cannot board and travel upon Amtrak trains without presenting a ticket to a conductor, signaling the passenger's assent to the Terms and Conditions of the ticket.

64.    In January 2022, Craig Thoms contacted the "Group Sales" department at Amtrak to book travel for a group of passengers—including Sanjay Chopra, A.C., and D.S.—from Raton, New Mexico to Milwaukee, Wisconsin, with Train 4 taking the group from Raton to Chicago.

65.    On January 14, 2022, Amtrak sent Craig Thoms a Group Travel Confirmation letter that stated, "Transportation on Amtrak is subject to the terms and conditions on your ticket and associated ticket jacket. Additional terms and travel information can be found on Amtrak.com."

15

66.    As of January 14, 2022, Amtrak's Terms and Conditions contained an Arbitration Agreement identical to that found in Version 2.9.16.

67.    On June 7, 2022, Amtrak mailed to Mr. Thoms individual tickets and ticket jackets for each member of the group.

68.    The tickets and ticket jackets stated "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL."

69.    The group, including Sanjay Chopra, A.C., and D.S., used their respective tickets to board and travel upon Train 4 starting in Raton; an Amtrak conductor lifted each of their respective tickets at 9:24pm on June 26, 2022.

70.    When the group members received and used their paper tickets in June 2022, Version 2.9.16 of the Terms and Conditions was in effect.

71.    Sanjay Chopra, A.C., and D.S. agreed to Version 2.9.16 of Amtrak's Terms and Conditions—including the binding Arbitration Agreement—by accepting and using their tickets subject to the Terms and Conditions.

72.    On April 18, 2022, Beverly Howard utilized Amtrak's over-the-phone virtual agent "Super Julie" to purchase an electronic ticket for Gary Jones to travel upon Train 4 departing Los Angeles on June 25, 2022 and arriving in Chicago on June 27, 2022.

73.    Accompanying Mr. Jones's electronic ticket was a message from Amtrak stating: "This ticket is a contract of carriage which includes specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The terms and conditions and arbitration agreement are available at Amtrak.com/terms-and-conditions.html."

16

74.    At the time Mr. Jones received his ticket, the arbitration agreement referenced in Amtrak's message was identical to that found in Version 2.9.16 of the Terms and Conditions.

75.    Gary Jones used his ticket to board and travel upon Train 4 starting in Los Angeles; an Amtrak conductor lifted his ticket at 8:09pm on June 25, 2022.

76.    When Gary Jones used his ticket on June 25, 2022, Version 2.9.16 of the Terms and Conditions was in effect.

77.    Gary Jones agreed to Version 2.9.16 of Amtrak's Terms and Conditions—including the binding arbitration agreement—by accepting and using his ticket subject to the Terms and Conditions.

78.    On June 8, 2022, Yanti Manurung utilized Amtrak's website to purchase a ticket for herself to travel on Train 4 departing Los Angeles on June 25, 2022 and arriving in Chicago on June 27, 2022.

79.    In purchasing the ticket for herself, Ms. Manurung affirmatively clicked the box stating that she read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 8, 2022.

80.    Ms. Manurung used her ticket to board and travel upon Train 4 starting in Los Angeles; an Amtrak conductor lifted her ticket on Train 4 at 7:08pm on June 25, 2022.

81.    On May 8, 2022, Joann Surko utilized an Amtrak agent to purchase an electronic ticket for herself to travel upon Train 4 departing Los Angeles on June 25, 2022 and arriving in Chicago on June 27, 2022.

82.    Accompanying Ms. Surko's electronic ticket was a message from Amtrak stating: "This ticket is a contract of carriage which includes specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The terms and conditions and

17

arbitration agreement are available at Amtrak.com/terms-and-conditions.html."

83.     At the time Ms. Surko received her ticket, the arbitration agreement referenced in Amtrak's message was identical to that found in Version 2.9.16 of the Terms and Conditions.

84.     Joann Surko used her ticket to board and travel upon Train 4 starting in Los Angeles; an Amtrak conductor lifted her ticket at 6:49pm on June 25, 2022.

85.     When Joann Surko used her ticket on June 25, 2022, Version 2.9.16 of the Terms and Conditions was in effect.

86.     Joann Surko agreed to Version 2.9.16 of Amtrak's Terms and Conditions— including the binding arbitration agreement—by accepting and using her ticket subject to the Terms and Conditions.

87.     On June 6, 2022, Dax McDonald purchased his own ticket online to travel on Train 4 departing Flagstaff, Arizona on June 26, 2022 and arriving in La Plata, Missouri on June 27, 2022.

88.     In purchasing the ticket for himself, Mr. McDonald affirmatively clicked the box stating that he read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 6, 2022.

89.     Mr. McDonald used his ticket to board and travel upon Train 4 starting in Flagstaff; an Amtrak conductor lifted his ticket on Train 4 at 7:43am on June 26, 2022.

90.     On June 2, 2022, Sheely McDonald utilized Amtrak's website to purchase tickets for herself, Samantha McDonald, and Dawn McDonald to travel on Train 4 departing Flagstaff, Arizona on June 26, 2022 and arriving in Fort Madison, Iowa on June 27, 2022.

18

91.    In purchasing the ticket for herself, Samantha McDonald, and Dawn McDonald, Sheely McDonald affirmatively clicked the box stating that she read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 2, 2022.

92.    Sheely McDonald, Samantha McDonald, and Dawn McDonald used their ticket to board and travel upon Train 4 starting in Flagstaff; an Amtrak conductor lifted each of their respective tickets on Train 4 at 7:43am on June 26, 2022.

93.    In May 2022, Beth Pettigrew contacted the "Group Sales" department at Amtrak to book travel for a group of passengers—including herself, Janelle Buffalo, Presley Hoover, Jennifer Kleehamer, Adrienne Price, Kylie Schmidt, Mark Schmidt, and Marta Schweitzer—on Train 4 departing Albuquerque, New Mexico on June 26, 2022 and arriving in Chicago on June 27, 2022.

94.    On May 6, 2022, Amtrak sent Beth Pettigrew a Group Travel Confirmation letter that stated, "Transportation on Amtrak is subject to the terms and conditions on your ticket and associated ticket jacket. Additional terms and travel information can be found on Amtrak.com."

95.    As of May 6, 2022, Amtrak's Terms and Conditions contained an Arbitration Agreement identical to that found in Version 2.9.16.

96.    On June 7, 2022, Amtrak mailed to Ms. Pettigrew individual tickets and ticket jackets for each member of the group.

97.    The tickets and ticket jackets stated "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL."

98.    The group, including Beth Pettigrew, Janelle Buffalo, Presley Hoover, Jennifer Kleehamer, Adrienne Price, Kylie Schmidt, Mark Schmidt, and Marta Schweitzer, used their

00129117

respective tickets to board and travel upon Train 4 starting in Albuquerque; an Amtrak conductor lifted each of their respective tickets at 6:29pm on June 26, 2022.

99.     When the group members received and used their paper tickets in June 2022, Version 2.9.16 of the Terms and Conditions was in effect.

100.    Beth Pettigrew, Janelle Buffalo, Presley Hoover, Jennifer Kleehamer, Adrienne Price, Kylie Schmidt, Mark Schmidt, and Marta Schweitzer agreed to Version 2.9.16 of Amtrak's Terms and Conditions—including the binding Arbitration Agreement—by accepting and using their tickets subject to the Terms and Conditions.

101.    On June 5, 2022, Sheila Smith utilized Amtrak's website to purchase a ticket for Michael Smith to travel on Train 4 departing Los Angeles on June 25, 2022 and arriving in Chicago on June 27, 2022.

102.    In purchasing the ticket for Michael Smith, Sheila Smith affirmatively clicked the box stating that she read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 5, 2022.

103.    Michael Smith used his ticket to board and travel upon Train 4 starting in Los Angeles; an Amtrak conductor lifted his ticket on Train 4 at 7:10pm on June 25, 2022.

104.    In contravention of the terms and conditions acknowledged and agreed to by and on behalf of Defendants, Defendants filed state court actions against BNSF.

105.    Defendants have refused to arbitrate their claims in accordance with the parties' Arbitration Agreement(s).

## COUNT I
### Petition to Compel Arbitration Pursuant to 9 U.S.C. § 4.

106.    BNSF incorporates the allegations set forth in Paragraphs 1-105 above as if fully

20

00129117

set forth here.

107.    The parties' Arbitration Agreement involves interstate commerce and states that it is governed by the Federal Arbitration Act.

108.    The parties' Arbitration Agreement is valid, irrevocable, and enforceable under the Federal Arbitration Act, 9 U.S.C. § 2.

109.    BNSF is aggrieved by Defendants' refusal to arbitrate.

110.    BNSF is entitled to an Order directing the parties to arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4.

111.    Service of this Complaint serves as the notice to Defendants that BNSF is petitioning the Court for such an Order. No sooner than five days after service of this Complaint, BNSF prays for a hearing to determine the matter.

112.    BNSF prays for an Order directing Defendants to arbitrate all their claims as set forth in their state court actions in accordance with the terms of the parties' Arbitration Agreement.

## <u>COUNT II</u>
### Petition to Stay State Court Actions Pursuant to 9 U.S.C. § 3

113.    BNSF incorporates the allegations set forth in Paragraphs 1-112 above as if fully set forth here.

114.    The claims Defendants brings in their State Court Actions are all referable to arbitration under the parties' Arbitration Agreement.

115.    A stay of the State Court Actions is necessary to effectuate an Order from this Court compelling arbitration.

116.    Pursuant to Section 3 of the Federal Arbitration Act, BNSF prays for an Order staying proceedings in the State Court Actions until the parties have arbitrated Defendant's claims.

00129117

## COUNT III
### Petition for Preliminary Injunction Pending Arbitration

117.    BNSF incorporates the allegations set forth in Paragraphs 1-116 above as if fully set forth here.

118.    An order prohibiting Defendants from litigating their claims in the State Court Actions is necessary to effectuate this Court's Order compelling the parties to arbitration.

119.    Without an injunction, BNSF will be irreparably harmed. Despite the parties' valid and enforceable Arbitration Agreement, BNSF will be subjected to the burdens and costs of civil litigation which are not applicable to arbitration proceedings and for which BNSF will have no remedy.

120.    There is a substantial likelihood that BNSF will prevail on the merits of this action, because the parties' Arbitration Agreement is valid and enforceable pursuant to the Federal Arbitration Act.

121.    There is little likelihood of harm to Defendants should a preliminary injunction issue. Defendants will be able to pursue any available remedies for their claims through arbitration, pursuant to the terms of the Arbitration Agreement.

122.    The public interest would be served in granting a preliminary injunction because it will promote the rapid and unobstructed enforcement of an agreement willingly entered into between parties, would prevent unnecessary waste of judicial resources, and would allow Defendants to promptly pursue their claims in arbitration.

123.    BNSF prays for a preliminary injunction prohibiting Defendants from pursuing the State Court Actions while the parties arbitrate their claims.

00129117

WHEREFORE, BNSF prays the Court grant the following relief:  For a hearing on this matter; for an Order compelling the arbitration of all of Defendants' claims arising out of or relating to the State Court Actions; for an Order staying the State Court Actions until the parties have completed arbitration; for an injunction prohibiting Defendants from pursuing the State Court Actions while the parties arbitrate; and for such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Sean P. Hamer*

| | |
|---|---|
| Sean P. Hamer | MO # 48153 |
| Scott R. Ast | MO # 51699 |
| Paula Brown | MO # 45870 |
| Alex A. McKenna | MO # 72024 |

SCHARNHORST AST KENNARD GRIFFIN, P.C.
1100 Walnut, Suite 1950
Kansas City, Missouri 64106
T: (816) 268-9400/F: (816) 268-9409
Email:  shamer@sakg.com
         sast@sakg.com
         pbrown@sakg.com
         amckenna@sakg.com

*Attorneys for BNSF Railway Company*

00129117